[691 NYS2d 22]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LUGO MIGUEL SANTIAGO, Appellant.

First Department, May 6, 1999

## APPEARANCES OF COUNSEL

*Risa Gerson* of counsel (*Richard M. Greenberg* and *Jacqueline Haberfeld* on the brief; *Office of the Appellate Defender* and *Weil, Gotshal & Manges,* attorneys), for appellant.

*David A. Shimkin* of counsel (*Edward L. Schnitzer* and *Stanley R. Kaplan* on the brief; *Robert T. Johnson, District Attorney* of Bronx County, attorney), for respondent.

**OPINION OF THE COURT**

SULLIVAN, J. P.

Defendant was convicted of fatally shooting Jorge Orgando, known to the eyewitness, Mariano Ginel, as "Monstero", on February 21, 1993, at approximately 12:30 A.M. as Orgando sat in his car on 182nd Street near Creston Avenue in the Bronx conversing with Ginel, a friend, who was standing between a parked car and Orgando's double-parked car.

Approximately one month prior to the shooting, Orgando had humiliated defendant after the two had argued. During that incident, Orgando pointed a gun at defendant and pulled the trigger. When defendant, unaware that the gun was not loaded, showed fear, the others present derided him. At the time of the shooting, Ginel observed defendant, whom he had known for about nine months—seeing him about four or five times a week—"walking down the middle of the block" and, within about five minutes, "c[o]me back walking up the block with his hand in * * * the pocket of his sweatshirt." Defendant, now with the hood of his sweatshirt up and wearing a ski mask, approached Orgando's car, pulled out what appeared to be a black 9-millimeter semiautomatic gun and fired one shot into the car, hitting Orgando. Ginel ran inside a building at 2229 Creston Avenue and watched from the door window as the wounded Orgando attempted to drive away. Defendant fired a second shot before Orgando's vehicle crashed into another vehicle. After the shooting, Ginel saw defendant cross the street and enter a grocery store. In July of 1993, Ginel went to the 46th Precinct and named defendant as the shooter.

At a pretrial *Sandoval* hearing, the prosecutor informed the court of his concern that his witnesses knew defendant by the street name, "Murder Mike", and that while he would not bring out defendant's sobriquet on his direct examination he sought a ruling allowing the introduction of the name if defense counsel challenged a witness's testimony as to how well he knew defendant. Defense counsel suggested that the witnesses refer to defendant as Mike. The trial court permitted testimony as to the full name, stating, "Whatever his nickname is, that's his nickname. If a witness testifies he knew him as Mike Murder, so be it." Defense counsel objected on the ground of prejudice but was overruled. The name "Murder Mike" was elicited

on numerous occasions during the direct examination of Ginel. Contrary to the People's argument, the issue is preserved.

It is clear that the nickname "Murder Mike" was only marginally relevant to Ginel's testimony identifying defendant as the shooter and its probative value outweighed by the danger of undue prejudice. The witness could just as easily have referred to defendant as "Mike" rather than "Murder Mike." Thus, "the purpose served by the challenged testimony could have been achieved without eliciting the prejudicial detail." (*People v Blanchard*, 83 AD2d 905, 906, *appeal dismissed* 56 NY2d 648.) The error in allowing testimony, in this murder case, of the nickname "Murder Mike" was further exacerbated by the prosecutor's summation in which he stated, "For what reason on earth would someone come in here and say Number 1, the defendant's name is Murder Mike and Number 2, he did shoot him. That's insane to think it's anything but accurate."

Since, however, there was overwhelming proof of defendant's guilt "provided by an eyewitness who recognized him at the scene of the crime and had an ample opportunity to observe him before, during and after the shooting" (*People v Carter*, 166 AD2d 660, 661, *lv denied* 77 NY2d 837; *see, People v David*, 243 AD2d 486, 487, *lv denied* 91 NY2d 871), and there is no "significant probability" that defendant would have been acquitted had the error, which was evidentiary in nature and not of constitutional dimension, not occurred, we find the error to have been harmless. (*People v Crimmins*, 36 NY2d 230, 242.) Defendant argues that evidence of his guilt was minimal, pointing to the fact that the shooter was wearing a ski mask at the time of the shooting and that Ginel admitted that he could see no identifying characteristics of the shooter other than his eyes. Ginel, who had known defendant for about nine months, was, however, unwavering and unshaken in his identification. He observed defendant minutes before the shooting, without any ski mask, from a distance of "no more than two feet." At that time, defendant "pass[ed] by [Ginel] in the middle of the block [,] * * * went in the middle of the block and came back up. He didn't go nowhere else." Thus, it can be inferred that Ginel was continuously aware of defendant's movements as the incident unfolded.

The People also offered the testimony of five other witnesses, each of whom confirmed aspects of Ginel's account of the shooting. Since Ginel had just seen defendant without a mask covering his face only minutes before the shooting, there was no

doubt as to his identification of defendant as the shooter. Defense counsel attempted, without success, to discredit Ginel's testimony, which significantly, also provided the motive for the shooting. Based on such a record, we cannot accept the notion that there is a significant probability that defendant was convicted because his street name was "Murder Mike."

Defendant also argues that one of the jurors was "grossly unqualified" (CPL 270.35 [1]) and should have been replaced. At the end of the first day of trial, Juror Number 3, who lived two blocks from the crime scene, asked to speak to the Judge and, in the presence of both counsel, but not defendant, said, "I live too close to the crime scene and I think that puts my family and me in danger." He did not know the defendant or the victim, but he recognized the latter from photographs and had seen him around the neighborhood. While he was not afraid of defendant, he answered "yes" when asked if he was "afraid of people who you think he knows?" Upon questioning by the court, he said that if the People proved their case beyond a reasonable doubt he would still be prepared to vote guilty and that if they did not prove their case, he was prepared to vote not guilty. In addition, he stated that he could vote "according to the evidence" and that he did not at that time feel that defendant was guilty. The People moved to disqualify the juror, but defense counsel did "not have an objection to him at this time", noting that while the juror "left [defense counsel] with the inference that he thought my client was guilty * * * [,]he stated he could be fair."

The court reserved decision, and the next day, without any additional evidence having been presented, and after defense counsel waived defendant's presence, the juror was questioned further. While he stated that "after the case is over, I won't feel that safe around my neighborhood," the juror confirmed that he would vote guilty if the People proved their case beyond a reasonable doubt and not guilty if the case was not proven. The People persisted in their request for the juror's removal, defense counsel again opposed and the court reserved decision. After Ginel testified, the juror was further examined, again with defense counsel waiving defendant's presence. He stated that he "felt much better" and that he could be "fair and impartial to both sides." When asked if he "still believe[d] that if [he] voted guilty, friends of the defendant will take vengeance on [him] or [his] family," he replied, "[N]ot really, at this time because I've done some small research and [there is a very slight chance] that that may happen * * * You know, ask

friends in cases like this. They told me it's all right. Just go for it." The court stated that it was "convinced that this juror is of a state of mind where he can render a fair and impartial verdict * * * [and saw] no reason for [the juror's] disqualification." Neither side argued against the court's decision.

■ ■ At the outset, we note that since defendant never objected to—and indeed argued against—the juror's removal, his present claim is unpreserved. (CPL 470.05 [2]; *see, People v Liriano*, 177 AD2d 423, 424, *lv denied* 79 NY2d 949.) Moreover, while defendant claims that the court's questioning of the juror in his absence violated his right to be present at a material stage of the trial, the in camera questioning of a seated juror is not a " 'material part' of a trial requiring the personal presence of defendant." (*People v Darby*, 75 NY2d 449, 453, quoting *People v Mullen*, 44 NY2d 1, 6; *see also, People v Aguilera*, 82 NY2d 23, 34.) Thus, counsel's waiver of defendant's presence is sufficient to effectuate such a waiver. (*See, People v Liriano, supra*, at 424; *People v Barreto*, 143 AD2d 920, 923, *lv denied* 73 NY2d 1011, 75 NY2d 767.)

Nor can it reasonably be said that defendant could have made a contribution at the interview with Juror Number Three, requiring his presence. Defendant argues that had he been present during the questioning of the juror, he might have been able to provide insight into whether the juror's fears "were real or merely pretext." Had the juror been truly fearful of retribution from defendant's friends or from defendant himself, however, such fear, and thus the juror's continued presence on the jury, could only have inured to defendant's benefit. Thus, since the outcome of the proceeding from which defendant was excluded—the court's denial of the prosecutor's motion to disqualify the juror—was "wholly favorable" to him, and, indeed, was the outcome defense counsel sought, defendant's presence was "superfluous". (*People v Roman*, 88 NY2d 18, 26; *People v Smith*, 82 NY2d 254, 268.)

■ As to the merits, "[i]f at any time * * * the court finds, from facts unknown at the time of the selection of the jury, that a juror is grossly unqualified to serve in the case or has engaged in misconduct of a substantial nature * * * the court must discharge such juror." (CPL 270.35 [1].) Defendant initially argues that Juror Number 3 was "grossly unqualified." Despite the juror's initial reservations, it is clear from his repeated and unequivocal assertions, in response to probing inquiry by the court, that he would be able to render an impartial verdict. (*Cf., People v Maddox*, 175 AD2d 183.)

Nor did the juror "engage[ ] in misconduct of a substantial nature." (CPL 270.35 [1].) Defendant asserts that, in disregard of the court's instructions not to talk about the case, the juror had a conversation with his wife and with friends regarding his fear of defendant and his associates. When the juror expressed some concern that someone close to defendant might take revenge on him or his family and the court inquired, "It's just something you're speculating about?", the juror responded, "Something that me and my wife have been talking about since the case started. She is planning on moving. I mean—I haven't had any sleep. Everything is complicated." And, as noted, during the final questioning of the juror, when asked if he still believed that defendant's friends might take vengeance on him or his family, he replied, "[N]ot really, at this time because I've done some small research and [there is a very slight chance] that that may happen * * * You know, ask friends in cases like this. They told me it's all right. Just go for it." There is nothing in either of these exchanges that suggests that the juror engaged in any substantive conversations regarding the facts of this case or any indication that the conversations were in other than the most general terms. (*Cf.*, *People v Fox*, 172 AD2d 218, *lv denied* 78 NY2d 966.)

Accordingly, the judgment of the Supreme Court, Bronx County (David Stadtmauer, J.), rendered October 11, 1995, convicting defendant, after a jury trial, of murder in the second degree and sentencing him to an indeterminate term of imprisonment of from 25 years to life, should be affirmed.

LERNER, MAZZARELLI, ANDRIAS and SAXE, JJ., concur.

Judgment, Supreme Court, Bronx County, rendered October 11, 1995, affirmed.