Judgment, Supreme Court, Bronx County (David Stadtmauer, J., at severance motion; John W. Carter, J., at jury trial and sentencing), rendered December 3, 2009, convicting defendant of murder in the first degree, murder in the second degree (two counts), attempted murder in the second degree, burglary in the first degree, attempted robbery in the first degree and criminal possession of a weapon in the second degree, and sentencing him, as a second felony offender, to an aggregate term of life without parole, unanimously affirmed.
On the evening of September 20, 2005, Johanna H. and Elvis H. were visiting the apartment that Miguel A. shared with Dilcia T. and her young son. According to Johanna, there was a knock on the door, and three men, one of whom was armed with a gun, forcibly entered and repeatedly threatened to kill everybody *489 if Miguel did not reveal where the “stuff” was. The men ransacked the apartment, bound the victims with duct tape, and took certain property from them.
Johanna testified that after beating Miguel, one of the men, whom she later identified as defendant, strangled, then shot Miguel. Elvis and Dilcia were also shot to death. Johanna was wounded in the shoulder. Johanna testified that when one of the men saw that she was still alive, defendant straddled her and fired another shot, which Johanna believed struck her right cheek. She also testified that, as the men fled, defendant fired multiple shots behind him and inadvertently struck one of his accomplices, whom she later identified as codefendant Jose Curet, in the arm. After the police arrived, Johanna told them what had happened and described the perpetrators.
The codefendant was arrested at the hospital where he was being treated for his gunshot wound. DNA testing revealed that bloodstains on his clothing belonged to Miguel and Elvis. Police were also given information that led to the arrest of defendant, who had Elvis’s cell phone in a bag in his car. Defendant’s own cell phone was found under Miguel’s body. Defendant made a written statement implicating himself and his codefendant in the crime, but claimed he was not the shooter. Johanna identified defendant in a photo array and defendant and codefendant in separate lineups.
The court properly exercised its discretion in denying, in part, defendant’s request for a severance of his trial from that of his codefendant and instead utilizing separate juries (see People v Ricardo B., 73 NY2d 228, 233-235 [1989]). The court excused defendant’s jury during certain portions of the trial pertaining specifically to the codefendant, which minimized any potential prejudice resulting from the two defendants’ antagonistic defenses (see People v Mahboubian, 74 NY2d 174, 183-184 [1989]). Defendant failed to present sufficiently strong grounds for ordering completely separate trials, given that the proof against the two defendants was supplied by the same evidence (see id. at 183). The use of separate juries effectively prevented defendant’s jury from hearing unduly prejudicial arguments or evidence relating to the codefendant. To the extent defendant’s jury may have heard anything it might not have heard at a separate trial, this did not deprive defendant of a fair trial under the circumstances. In any event, any error in this regard was harmless in light of the overwhelming evidence of guilt (see People v Crimmins, 36 NY2d 230 [1975]). In addition to the eyewitness identification testimony of a surviving victim and defendant’s own admissions that tied him to the crime, the evi *490 dence showed that defendant was arrested while in possession of a cell phone belonging to one of the victims and that he left his own cell phone at the scene of the crime. The account of the eyewitness, who had ample opportunity to observe defendant during the commission of the crime, was also consistent with the physical evidence found at the scene. The Crime Scene Unit found that the three deceased victims had been bound with duct tape and that all had gunshot wounds. The medical examiner concluded that Miguel had been strangled and that he had a gunshot wound to the head. A ballistics examination revealed that the shell casings found throughout the apartment were all fired from the same gun.
The court should have permitted defense counsel to conduct some re-cross-examination of a crime scene detective after the codefendant’s counsel inquired into new areas on cross-examination that were not addressed in the People’s direct examination (see Spatz v Riverdale Greentree Rest., 256 AD2d 207, 208 [1st Dept 1998]). The codefendant’s counsel’s cross-examination concerned the failure to swab blood from inside the apartment, which, according to defendant, could have led the jury to speculate about whether the codefendant was bleeding in the apartment after being shot by defendant, supporting the codefendant’s contention that defendant tried to kill him to eliminate him as a witness. However, the error was harmless. In addition to the overwhelming evidence of defendant’s guilt, it had already been established that the codefendant had been shot and that his DNA matched the blood found in the hallway. The testimony developed by codefendant’s counsel related to whether codefendant bled or did not bleed inside the apartment, and did not establish that defendant intended to shoot his codefendant.
Defendant’s constitutional argument that the preclusion of his redirect examination violated his right to confront the witness against him is not preserved (see e.g. People v Lane, 7 NY3d 888, 889 [2006]; People v Kello, 96 NY2d 740, 743 [2001]), and we decline to review it in the interest of justice. As an alternative holding, we find that any constitutional error in this regard was likewise harmless beyond a reasonable doubt (see People v Eastman, 85 NY2d 265, 276 [1995]).
When the surviving eyewitness, as a result of an objection by codefendant’s counsel, attempted to distinguish defendant from the other perpetrators of the crime by repeatedly referred to him as “the assassin,” i.e. the shooter, the court should have promptly directed her to use a more neutral word. However, we find this error to be harmless since the evidence of defendant’s *491 guilt was overwhelming, and the error was not unduly prejudicial under the circumstances of the case (People v Santiago, 255 AD2d 63, 65-66 [1st Dept 1999], lv denied 94 NY2d 829 [1999]).
When asked to elaborate as to why she described defendant as the assassin, the witness, who testified through an interpreter, explained that “he was the one who shot [her].” The term was not defendant’s street name or nickname and, thus, did not reference any prior criminal conduct or criminal propensity on his part.
Significantly, the court gave limiting instructions advising the jury that the term assassin was the witnesses’s characterization and that “[t]he People have to prove their case beyond a reasonable doubt as to the charges contained in the indictment,” and later that it was “allowing [the witness] to use the term ‘assassin’, solely as a means of identifying and distinguishing among the people that she says were in the apartment that night on September . . . 20[,] 2005. Solely for that purpose. You are to draw no other inference from the use of that term” (see People v Smith, 97 NY2d 324, 330-331 [2002]). In its final charge the court reiterated that the People must prove each element of the crimes charged beyond a reasonable doubt, including that it was defendant who committed the crime. The court also instructed that the jury should determine whether the testimony of any witness who identified defendant as the perpetrator was both truthful and accurate, setting forth various factors related to identification that the jury should consider. It is presumed that the jury followed the court’s instruction (see People v Davis, 58 NY2d 1102, 1104 [1983]). Moreover, the prosecutor did not use the term assassin in his opening statement or closing argument.
Defendant’s constitutional argument that the repeated reference to him as the assassin violated his rights to a fair trial and due process is not preserved, and we decline to review it in the interest of justice. Defense counsel’s objections were general or evidentiary and failed to alert the trial court of his constitutional claims (see People v Angelo, 88 NY2d 217, 222 [1996]). As an alternative holding, we find that the error was not of a constitutional dimension and that in any event the use of the term assassin during trial, which was limited to distinguishing the three perpetrators and their role in the murders, neither absolved the prosecution of having to prove beyond a reasonable doubt that defendant was the shooter, nor undermined the defense that the shooter was the “young kid” referenced in his written statement.
Defendant asserts that his counsel rendered ineffective assis *492 tance by referring to him as “the assassin” while cross-examining the witness. This claim is unreviewable on direct appeal because it involves a matter of strategy outside the record (see People v Rivera, 71 NY2d 705, 709 [1988]; People v Love, 57 NY2d 998 [1982]). On the existing record, to the extent it permits review, we find that defendant received effective assistance under the state and federal standards (see People v Benevento, 91 NY2d 708, 713-714 [1998]; see also Strickland v Washington, 466 US 668 [1984]). Defense counsel may have reasonably decided that after his objection to the use of the term during direct examination was overruled, the best approach was not to attempt to change the witness’s word choice but to phrase his questions in a manner clarifying that this was merely the term she had used for defendant. Accordingly, counsel used phrases such as “the person you called The assassin.’ ” Defendant has not shown that such a strategy fell below an “objective standard of reasonableness” (Strickland, 466 US at 688), or that it had a reasonable probability of affecting the outcome (id. at 694).
There is no merit to defendant’s assertion that by referring to him as the assassin, his attorney undermined his misidentification defense. At various times during cross-examination, defense counsel attempted to get the eyewitness to admit that she was not focused on and never really got a chance to see “the assassin’s” face, that she was not 100% certain when she made her lineup identification of defendant, and that when interviewed after the crime, she did not inform detectives that “the assassin” was wearing a hat. It was obvious to the jury that the defense was not conceding anything (see People v Carver, 234 AD2d 164 [1996], lv denied 89 NY2d 1010 [1997]), and the court sufficiently instructed the jury to consider this term only as the witness’s way of distinguishing between the participants in the crime.
All of defendant’s arguments concerning the autopsy report and the late disclosure of allegedly exculpatory material are unpreserved, and we decline to review them in the interest of justice. As an alternative holding, we reject them on the merits.
We perceive no basis for reducing the sentence. Concur— Mazzarelli, J.E, Andrias, Freedman and Gische, JJ.