OPINION OF THE COURT
 

 Smith, J.
 

 The issue here is whether the trial court erred in denying defendant’s motion for a mistrial where a nontestifying witness’ statement was inadvertently included on the back of a trial exhibit provided to the jury. We conclude that the strong curative instruction from the court and overwhelming proof of defendant’s guilt render any error harmless beyond a reasonable doubt.
 

 At about 4:30 a.m. on August 30, 1998, Robert Drummond and Malik Robertson were seated in a car near Burt Street in Syracuse, New York. A masked person, wearing a black hooded sweatshirt and pedaling a black mountain bike, approached the car from the rear and passed along the passenger side, around the front of the vehicle, then down the driver’s side. The masked person aimed a gun and fired at Robertson who was sitting in the passenger seat but jumped into the back seat as the shooting started. The bullets killed Drummond and wounded Robertson. The shooter rode away.
 

 On August 30 and again on September 1, detectives from the Syracuse Criminal Investigation Division picked up defendant for questioning. In a signed statement made on September 1, defendant confessed to the shootings. Subsequently, defendant was indicted in Onondaga County on charges of murder in the second degree (Penal Law § 125.25 [1]), attempted murder in
 
 *326
 
 the second degree (Penal Law §§ 110.00, 125.25 [1]) and criminal possession of a weapon in the second degree (Penal Law § 265.03).
 

 Defendant moved to suppress the confession as involuntary. At a
 
 Huntley
 
 hearing
 
 (People v
 
 Huntley, 15 NY2d 72 [1965]), Detective Jiminez testified that on August 30, defendant voluntarily accompanied him to police headquarters to be questioned and that defendant read and signed a “Statement Cover Sheet” indicating that he had been given
 
 Miranda
 
 warnings. Defendant initialed each of the warnings. The interview lasted approximately two hours and then the detective took defendant home. Detective Quonce testified that on September 1, he also gave defendant
 
 Miranda
 
 warnings before beginning the questioning. Detective Teater testified that when he took over the questioning, he gave defendant fresh
 
 Miranda
 
 warnings. After questioning, defendant provided a written confession and, later, a videotaped confession. Supreme Court denied the motion to suppress the statement.
 

 At trial before a jury, defendant’s signed confession was admitted into evidence. In it defendant stated that on August 30, he went to a party on Burt Street, that he rode a black mountain bike, and that he carried a loaded plastic Clock 9 mm gun with him. At approximately 4:30 a.m., he was told that Robertson, who was in a rival gang, and with whom he had a feud, was present at the party. Defendant rode his bike around the car in which Robertson sat with another man. He aimed the gun at Robertson and fired. He then rode the bike away toward Montgomery Street. On the next day, he broke up the gun with a short-handled sledge hammer and threw the pieces into Onondaga Lake. On the morning of the shooting, he was wearing a black hooded sweatshirt.
 

 At trial, however, defendant recanted this confession and testified that while he had been at the party, he left at approximately 1:00 a.m. with a friend, Abraham Whaley, before the crimes were committed. Defendant testified that they were picked up by a friend, Michelle Fudge, that the three went to a restaurant to eat, and that Fudge dropped defendant and Whaley off at defendant’s house at about 2:00 a.m., where defendant watched television until he fell asleep. Defendant denied riding a bike to the party, owning a bike, owning a gun, having a problem with Robertson, being a member of the rival gang with whom Robertson’s gang was feuding, being at a party at 4:30 a.m. or wearing a black hooded sweatshirt.
 

 
 *327
 
 He further testified that while he was not hit or physically abused by the detectives, he had signed the confession as a result of duress. This duress consisted of being picked up by the police at his home at six or seven in the morning after the shooting, being kept at the station all day, and repeatedly asking for his lawyer but having these requests ignored. Defendant testified that he was questioned in a small room, sometimes by two detectives, and that they yelled at him and told him that he could not leave until he gave a statement. He testified that the detectives fabricated the confession and that he had to answer their questions “yes” in order to be allowed to leave.
 

 Detective Abraham testified that on September 1, 1998 at about 6:45 a.m., he and his partner, Detective Quonce, picked up defendant at his home for further questioning. At the station, defendant was read his
 
 Miranda
 
 rights and then questioned until 12:30 p.m. Approximately once an hour, defendant was given 10-minute breaks and offered food or water which he refused.
 

 Detective Teater testified that he took over the questioning at 12:30 p.m. and that at that time, defendant asked for water and was re-read his
 
 Miranda
 
 rights. From 12:30 p.m. to 2:05 p.m., Teater questioned defendant. When defendant started to cry, the detective left the room and came back at 2:30 p.m. Very shortly after Teater and Detective Quatrone re-entered the room, defendant confessed to the shooting. Teater testified that before they took the statement, they Mirandized defendant and had him sign a Statement Cover Sheet and that the process of taking the statement involved their speaking with defendant about the events and asking clarifying questions, with Quonce then typing up the statement. Teater further testified that defendant drew a map of the crime scene, accompanied the detectives to Onondaga Park, showed them where he threw the gun in the lake, and identified the bike that he had used. Pieces of the gun were never found.
 

 Quatrone also testified at trial. According to Quatrone, after defendant was brought back to the station, around 5:50 p.m., the detectives made a post-confession videotaped interview with defendant. Quatrone further testified that later that evening, defendant met with his mother, who had come down to the station, and that he overheard defendant confess to his mother that he had fired the shots that killed Drummond and wounded Robertson.
 

 
 *328
 
 Robert Hunt testified at trial that on the evening of August 30, he went to the party with his friend Mike. Hunt saw a person on a bicycle ride around the car in which Robertson was sitting, approach the back side of the passenger side and start shooting. Hunt knew that the shooter was defendant because of his large size, because of how he looked and how he walked. Hunt testified that defendant wore a black hooded sweatshirt and a mask over his face. On cross-examination, Hunt admitted that he had told the grand jury that he did not know who did the shooting “face-wise,” but that he could tell “body-wise.” On cross-examination, Hunt further admitted that he told one Robert Davis that he knew that defendant did not do the shooting, “but that [he was] going to come down here and do what [he] had to do because [he has] a baby and because [he was] on probation.” On redirect, Hunt testified that he had falsely told the grand jury that he could not recognize the shooter because he was scared, because defendant was a Mend and because he did not want to testify against defendant.
 

 During deliberations, the jury asked in writing whether it should have been given a statement by Michelle Fudge, who did not testify at the trial. Fudge’s statement appeared on the back of trial exhibit 39, admitted into evidence, which consisted of Detective Teater’s handwritten notes detailing the chronology of defendant’s interrogation. In Fudge’s statement, made to the police, she averred that she had not given defendant and Whaley a ride on the evening of the crimes. She indicated that two weeks prior to the shooting, she had given defendant and Whaley a ride and that it was then that the three had gone to a restaurant. At least six of the jurors read Fudge’s statement in its entirety. The court ruled — and the People agreed — that the jury should not have received the statement.
 

 Defendant moved for a mistrial, arguing that the statement from “a prosecution witness without ability to cross-examine” was fundamentally unfair because the statement “directly contradict [s] Mr. Smith’s testimony that she gave him the ride on the morning of August 30 before the shooting took place * * *.” The trial court denied the mistrial motion and, instead, gave the following instruction:
 

 “Now [Michelle Fudge’s statement] is hearsay. Whoever this person is, Michelle Fudge, was not called into this courtroom. None of you had the opportunity to observe her demeanor. She was neither conducted
 
 [sic]
 
 for direct examination nor
 
 *329
 
 cross-examination. Neither side had the right to confront and cross-examine her. You do not know whether she has an axe to grind with anybody, whether she has a recollection that’s good or bad. You don’t know, and I’m not, I don’t know who Michelle Fudge is and I do not mean to disparage her, please don’t misunderstand me. You do not know whether she had been drinking that night or whether she has a bad memory or whether there’s anything else about her ability to see, hear, know, and remember that would permit you to place any reliance upon any statement made. Statements are not allowed in evidence, as you know. A prior statement by anybody is not allowed in evidence absent some special rule that’s applicable in terms of if they’re not here to be cross-examined, then you may place no weight whatsoever and to the extent that any of you read any portion of that, you are instructed to disregard it in its entirety.”
 

 After polling the jury to determine which jurors had seen the statement, the court further admonished those jurors to disregard the statement and not share it with the others.
 

 The jury convicted defendant on the charged offenses and defendant appealed. A divided Appellate Division reversed, holding that Supreme Court had incorrectly denied the motion for a mistrial. It reasoned that insofar as Fudge’s statement was not in evidence, and insofar as she did not testify, defendant’s right to confrontation was “infringed.” (283 AD2d 908, 909.) The Court further held that, “[a]lthough the court gave a strong curative instruction, * * * the prejudicial effect upon the jury was not alleviated by the instruction * * * [and] there [was] a ‘reasonable possibility that the error might have contributed to defendant’s conviction,’ and thus the error [was] not harmless beyond a reasonable doubt”
 
 (id.).
 
 Two Justices dissented, concluding that the trial court did not abuse its discretion in denying the motion for a mistrial, and that the instruction cured the error, which was, in any case, harmless as the evidence against defendant was overwhelming. We now reverse.
 

 We turn first to the question of whether defendant preserved his objection to the denial of his motion for a mistrial. Section 470.05 (2) of the Criminal Procedure Law provides in pertinent part:
 

 “[A] party who without success has either expressly
 
 *330
 
 or impliedly sought or requested a particular ruling or instruction, is deemed to have thereby protested the court’s ultimate disposition of the matter or failure to rule or instruct accordingly sufficiently to raise a question of law with respect to such disposition or failure regardless of whether any actual protest thereto was registered.”
 

 Defendant’s motion for a mistrial and Supreme Court’s denial of that motion sufficiently preserved the question of law for our review.
 

 Defendant argues that the error in placing the Fudge statement before the jury was constitutional and denied him a fair trial. We assume for present purposes that there was constitutional error.
 

 As noted in
 
 People v Crimmins
 
 (36 NY2d 230 [1975]), a constitutional error requires a reversal of a conviction and a new trial unless the error is harmless beyond a reasonable doubt, that is, “there is no reasonable possibility that the error might have contributed to defendant’s conviction” (36 NY2d, at 237). A parallel and sometimes overlapping doctrine is that a trial must be fair
 
 (id.,
 
 at 238).
 

 While some of the jurors saw Fudge’s statement, it does not follow that defendant’s conviction should be reversed. The Constitution entitles a criminal defendant to a fair trial, not a perfect one
 
 (see, Delaware v Van Arsdall,
 
 475 US 673, 681 [1986]). Even when constitutional errors, as other errors, have occurred in a case, they do not require reversal when a reviewing court can conclude with confidence that they were harmless beyond a reasonable doubt. “The harmless-error doctrine recognizes the principle that the central purpose of a criminal trial is to decide the factual question of the defendant’s guilt or innocence * * * and promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error”
 
 (id.).
 

 In the present case, there is no reasonable possibility that the error might have contributed to defendant’s conviction because proof of defendant’s guilt, without reference to the error, is overwhelming. The record reflects that defendant was given
 
 Miranda
 
 warnings before he gave the confession that was recorded by the detectives; the confession described the motive and method for the shootings; defendant provided drawings of the place where he disposed of the gun; and he identi
 
 *331
 
 fled the bike that he rode that early morning. In addition, Detective Quatrone testified, without challenge, that he heard defendant confess the shooting to his mother. Eyewitness Hunt testified that he saw defendant commit the crimes. On the whole record, including the curative instruction, the submission of Fudge’s statement to the jury was harmless beyond a reasonable doubt. The trial court did not abuse its discretion in denying defendant’s motion for a mistrial.
 

 A further observation is warranted. Defendant testified that he was dropped off by Michelle Fudge around 2:00 a.m. The shooting did not occur until 4:30 a.m. While Michelle Fudge’s statement contradicted defendant’s testimony, it did not present an alibi.
 

 Accordingly, the order of the Appellate Division should be reversed and the case remitted to that Court for consideration of the facts and issues raised but not determined on the appeal to that Court.
 

 Chief Judge Kaye and Judges Levine, Ciparick, Wesley, Rosenblatt and Graffeo concur.
 

 Order reversed, etc.