=================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
-----------------------------------------------------------------
No. 32
The People &c.,
            Respondent,
        v.
Darius Dubarry,
            Appellant.




            Denise A. Corsi, for appellant.
            Thomas M. Ross, for respondent.




RIVERA, J.:

        This appeal presents the novel question of whether

defendant may be subject to multiple liability for a single

homicide under a "transferred intent" theory, where defendant

kills one victim in the course of attempting to kill someone

else.  We conclude that defendant cannot be convicted of depraved

indifference murder and intentional murder on a transferred

- 1 -

intent theory in a case involving the death of the same person. Therefore, the trial court erroneously submitted to the jury both charges in the conjunctive rather than in the alternative. We also hold that admission into evidence of certain grand jury statements of a non-testifying witness violated defendant's Sixth Amendment right to confrontation. The Appellate Division order should be modified, and a new trial ordered on the intentional murder, depraved indifference murder, and attempted murder counts.

I.

The underlying criminal prosecution of defendant Darius Dubarry stems from the fatal shooting of a bystander during a gun fight between defendant and co-defendant Herburtho Benjamin. At trial, defendant admitted shooting at Benjamin, but claimed Benjamin was the aggressor and that defendant acted in self defense.

According to the testimony presented by the People, Benjamin and approximately ten men went to a residential building in Brooklyn, New York, looking for someone who had previously assaulted one of the men. While they were standing inside the lobby they saw defendant walk down the staircase. Defendant, a member of the Lek Lekah Israelites, had just left Sabbath services when he, in turn, saw the men. After defendant walked by, someone in the group said, "That's him." Benjamin and the

others then followed defendant outside, and dispersed on the street.

Several of the men in the group testified that once outside they saw defendant in front of the building, and observed defendant and Benjamin pull out guns and shoot at one another. The People also submitted video tape footage from the building depicting the shootout and defendant extending his arm to fire a gun before he reentered the building. The forensic evidence established that one of the bullets fired by defendant fatally struck the victim, who was uninvolved in the events and innocently standing a few buildings away from the shooting.

Soon after the shooting, defendant left the scene, and approximately a week later the investigating detectives located him listed under an assumed name in a hotel in Georgia. Defendant was taken to a local Sheriff's Office where he waived his Miranda rights and provided oral and written statements to the New York detectives. In these statements defendant explained that on the day of the shooting he was leaving services when he saw several men in the lobby. The men then followed him outside where he was confronted by Benjamin who pointed a gun at him. Defendant claimed he heard a click, and then a shot. Defendant then shot back at Benjamin and ran into the building.

In addition to this evidence, the People sought to present eyewitness testimony of one of the building's residents who had previously testified before the grand jury that he saw

defendant fire the initial shot at Benjamin.  However, during the course of the trial the witness refused to testify because of threats against his family.  Outside of the jury's presence the court held a <u>Sirois</u> hearing to determine whether defendant procured the witness's refusal by threats or violence.[1]

At the hearing, the witness recounted how just the day before, his brother and sister visited him and told him that they were "getting hostility around the neighborhood" because he "was making a statement against the defendants."  Specifically, his brother told him that the Israelites thought the witness was a "snitch".  His sister similarly informed him that someone had told her that the Israelites suspected the witness of snitching and that the Israelites were "serious."  The witness stated that his siblings' demeanor during the visit indicated to him that these were indeed threats.

The witness further informed the court that he was fearful because his family still lived in the neighborhood where the shooting occurred, and he thought his brother and sister would be hurt if he testified.  He also said that he had not told anyone that he had cooperated and he did not even know until that

_____

[1] At a <u>Sirois</u> hearing, named after the defendant in the criminal case considered in <u>Matter of Holtzman v Hellenbrand</u> (92 AD2d 405 [2d Dept 1983]), <u>People v Sirois</u>, the court determines whether the People have established that defendant's misconduct induced a witness's unlawful refusal to testify.  Where the People meet their burden, the defendant is "deemed to have waived any objection to the admissibility of the witness' prior Grand Jury testimony" (<u>Matter of Holtzman</u>, 92 AD2d at 415).

day that the People intended to call him at trial. In response to the court's question, the witness, who was incarcerated in a federal detention center on an unrelated matter, claimed that even if held in contempt, and additional time was added to his sentence, he would not testify against defendant.

Based on this testimony the court concluded that "these threats have been made, that the witness believes that if he does testify concerning the events... his family is in harm's way and that his refusal to testify is based upon these threats and these threats solely." The court also determined that it could not compel the witness to testify because he was serving a federal sentence. The court then recalled the jurors, and over defendant's objection, allowed the prosecutor to read the witness's grand jury testimony into evidence.

According to that testimony, on the day of the shooting the witness looked out the window of his fifth floor apartment and saw defendant and a group of people walk out of the building. He saw defendant start smoking a cigarette, walk down two steps and then start shooting. The witness stepped back from the window. A few minutes later he again looked out, and this time observed defendant exit the building with one of the Israelites, and then enter a car and drive away. The witness stated that he had seen defendant every week in the building and recognized him as someone who attended the Israelites' services.

Defendant testified on his own behalf, and claimed that

Benjamin shot first and for no apparent reason.  He explained
that he had come into possession of the gun that he used to shoot
at Benjamin from a male member of the Israelites' congregation.
He stated that on the day of the shooting he was escorting
several female members from the services when this member told
defendant he was going to handle a problem and showed defendant
the gun.  Defendant told him to "chill out," took the gun, and
said that they would dispose of it when defendant returned from
escorting the women out of the building.

Once downstairs defendant saw the men in the lobby and
recognized one of them as a resident from the building.  He
claimed that he was in front of the building smoking a cigarette
when the men followed him outside, and as he turned to reenter
the building he heard someone say "Move. Move. Move."  When he
turned around again he saw Benjamin pointing a gun at him.  He
claimed he did not know Benjamin and that he froze when he saw
the gun.  According to defendant, Benjamin pulled the trigger
twice, but the gun failed to fire.  When Benjamin fired again
defendant fired several shots back.

Defendant further testified that he had never handled a
gun before the shooting, and did not know what he did with it
afterwards.  Defendant described how after the gunfight he
returned to the apartment where services had been held, and
stayed there until he subsequently drove away.  Two days later he
went to Georgia, out of fear of Benjamin and others in the group

who defendant believed were gang members, and so his family would have time to retain counsel.  He further claimed that the statements made to the detective in Georgia were coerced.

As relevant to this appeal, at the pre-charge conference and later during discussion of the verdict sheet, the trial court stated that the intentional murder and depraved indifference murder were separate crimes and that the jury had to consider both.  Defense counsel also argued during the pre-charge conference that the evidence was insufficient to establish depraved indifference murder based on defendant engaging in mutual combat with Benjamin.

The Court thereafter submitted to the jury in the conjunctive depraved indifference murder and intentional murder on a transferred intent theory.  In other words, the court instructed the jury to consider depraved indifference murder and, irrespective of its verdict on that count, to then consider intentional murder.  Also, the court's instructions on depraved indifference murder required the jury to find, beyond a reasonable doubt, that defendant and Benjamin engaged in mutual combat.  The court charged as lesser included offenses to the murder counts first and second degree manslaughter.  The court also charged the jury on attempted murder in the second degree, assault in the first degree, and criminal possession of a weapon in the second degree.  The court charged the defense of justification with respect to intentional murder in the second

degree, manslaughter in the first degree, attempted murder in the
second degree, and attempted assault in the first degree.

The jury returned guilty verdicts on depraved
indifference murder (Penal Law § 125.25 [2]), intentional murder
on a transferred intent theory (Penal Law § 125.25 [1]),
attempted murder in the second degree (Penal Law §§ 110.00,
125.25 [1]), and criminal possession of a weapon in the second
degree (Penal Law § 265.03 [1] [b]).  Defendant appealed.

The Appellate Division affirmed (People v Dubarry, 107
AD3d 822 [2d Dept 2013]).  The court found the case involved more
than one potential victim, thus permitting defendant's
convictions on the murder counts based on defendant's different
states of mind as regards to each victim.  The Appellate Division
further concluded the trial court properly admitted the
unavailable witness's grand jury testimony because the People
established by clear and convincing evidence that the witness's
unavailability was procured by defendant's misconduct.  The court
rejected the remainder of defendant's claims.  A Judge of this
Court granted leave to appeal (22 NY3d 1040).

II.

Defendant claims the trial court violated his due
process rights when it submitted to the jury depraved
indifference murder and intentional murder on a transferred
intent theory in the conjunctive with respect to the same victim.

He contends that where the actual and intended victims are different, conviction on both murder counts unlawfully subjects him to multiple criminal liability for a single homicide. The People respond that the convictions should be affirmed because each murder count requires its own particular culpable mental state and outcome.

As a threshold matter, we reject the People's argument that defendant's challenge to the jury instructions is unpreserved. The record establishes that the trial court considered depraved indifference and intentional murder as separate crimes that the jury must independently consider. During the charge conference the trial court stated that there is a "distinct difference in the crimes." Later, in response to defendant's concerns as to whether the verdict sheet should direct the jury to consider depraved indifference murder if it found defendant guilty of intentional murder, the court responded, "I think they have to. It's a totally different separate element." These statements, and the court's eventual submission of the counts in the conjunctive establish the court's rejection of alternative charges. Thus, defendant's claim is properly before us on this appeal (CPL 470.05; see People v Prado, 4 NY3d 725, 726 [2004]).

On the merits, we agree with defendant that, on the facts of this case, the transferred intent theory cannot be employed to convict him twice for the murder of the same victim.

We reach this conclusion based on our reading of the Criminal Procedure Law and the Penal Law, our case law, and the stated purpose of the transferred intent theory.

We begin our analysis with People v Gallagher, wherein the Court held that in single homicide cases, intentional and depraved murder counts must be submitted to the jury in the alternative (People v Gallagher, 69 NY2d 525 [1987]).  In Gallagher, the trial court denied defense counsel's request to charge intentional murder and depraved mind murder in the alternative[2] (id. at 528 [1987]).  The Court concluded that was error, holding these counts inconsistent within the meaning of CPL 300.30(5), "because guilt of one necessarily negates guilt of the other" (id. at 529).  As the Court recognized, a finding of intentional murder is inconsistent with a finding that the defendant "unintentionally kill[ed] [the] same victim under circumstances evincing a depraved indifference to human life" (id., at 530).  Logically, "[t]he act is either intended or not intended; it cannot simultaneously be both" (id.; see also People v Robinson, 75 NY2d 879 [1990]).

This appeal presents the question whether a defendant may be convicted for both depraved indifference murder and

---

[2] Prior to 1998, we referred to murder under Penal Law § 125.25 (2) as depraved mind murder.  We have since generally referred to murder under this section as depraved indifference murder, without any legal significance attached to the different nomenclature adopted by the Court.

intentional murder based on the theory of transferred intent, as charged in the conjunctive, when the defendant kills one person while intending to kill another.  The Appellate Division is divided on this issue.  On the one hand the Third Department in People v Molina (79 AD3d 1371 [3d Dept 2010]), held that a defendant may be found guilty of *either* intentional murder under the doctrine of "transferred intent," or depraved indifference murder for shooting at an intended victim and killing a bystander.  Otherwise, a charge in the conjunctive "impermissibly takes the issue of determining mens rea out of the jury's hands" and multiplies liability (Molina, 79 AD3d at 1374).

In contrast the Fourth Department concluded in People v Henderson (78 AD3d 1506 [4th Dept 2010]), that "defendant may be convicted of both [intentional and depraved indifference crimes] because [defendant] may have possessed different states of mind with regard to different potential victims" (id. at 1507). Similarly, the Second Department in People v Douglas (73 AD3d 30 [2d Dept 2010]), concluded the rule that a defendant cannot be guilty of intentional and reckless assault for the same individual does not apply where the defendant lacks an intent to injure the victim, but the crime is deemed intentional by operation of law under a theory of transferred intent.  The First Department in People v Monserate (256 AD2d 15 [1st Dept 1998]), upheld the submission of intentional murder and depraved

indifference murder in the conjunctive for the death of a bystander, shot in a gun battle, because by acting intentionally as to his intended victim, defendant caused the death of the bystander with transferred intent, and with depraved indifference. As these decisions show, resolution of this issue depends on the proper interpretation of what constitutes the defendant's act and state of mind. That, of course, requires an understanding of the terms and purpose of the transferred intent theory.

The transferred intent theory, codified under Penal Law § 125.25 (1), provides that "where the resulting death is of a third person who was not the defendant's intended victim, the defendant may nonetheless be held to the same level of criminal liability as if the intended victim were killed" (People v Fernandez, 88 NY2d 777, 781 [1996]). This theory of intent is founded on a legal fiction, whereby once the state of mind is established the identity of the victim is irrelevant (Fernandez, 88 NY2d at 781). The theory is deployed in order to permit a jury to find defendant guilty of intentional murder, even though technically lacking an intentional state of mind with respect to the actual victim (Fernandez, 88 NY2d at 781).

The purpose of the transferred intent theory is "to ensure that a person will be prosecuted for the crime [that person] intended to commit even when, because of bad aim or some other 'lucky mistake,' the intended target was not the actual

victim" (Fernandez, 88 NY2d at 781, citing People v Birreuta, 162 Cal App 3d 454, 459 [Cal Ct App 1984]). Given this stated goal, the Court has cautioned that transferred intent "should not be employed to 'multiply criminal liability, but to prevent a defendant who has committed all the elements of a crime (albeit not upon the same victim) from escaping responsibility for that crime" (Fernandez, 88 NY2d at 782, citing Ford v State, 330 Md 682, 711 [1993]). Hence, it should be applied where a defendant "could not be convicted of the crime because the mental and physical elements do not concur as to either the intended or actual victim" (Fernandez, 88 NY2d at 782, citing Ford, 330 Md at 711).

With this understanding, we conclude that this Court's prior analysis in Gallagher applies with equal force when the People proceed on a transferred intent theory. Whether based on the defendant's conscious objective towards the intended victim, or on a transferred intent theory directed at a different, and actual, victim, defendant's conviction depends on a jury finding that defendant harbored the requisite intentional mental state. Defendant cannot then also be guilty of the same murder premised on a depraved state of mind.

That the People had at their disposal two bases by which to establish the requisite state of mind -- transferred intent and depraved indifference -- does not permit the People to seek multiple convictions for the one murder for which the

defendant was charged, prosecuted and tried.  To hold otherwise
is contrary to "the basic principle that a defendant should not
be convicted and punished more than once for conduct which,
although constituting only one prohibited act, may because of
statutory definition, be theorized as constituting separate
criminal acts" (People v Perez, 45 NY2d 204, 208 [1978]).  Under
New York law, defendant is held accountable for the murder he
committed, even if it was not the one he set out to complete
(Penal Law 125.25 [1]).

Moreover, defendant's state of mind is a matter for the
jury (see Gallagher, 69 NY2d at 530), and as we have held
depraved indifference is a culpable mens rea, distinct from the
mens rea required for intentional murder (People v Feingold, 7
NY3d 288, 294 [2006]).  Permitting conjunctive charges of
depraved indifference and intentional murder based on transferred
intent absolves the jury of rendering a verdict based on a proper
determination of the defendant's state of mind.

The People's main argument in support of the jury
charge and defendant's conviction is that the counts are based on
different states of minds and outcomes.  According to the People,
there is no multiple liability on the facts of this case because
the conviction for intentional murder required establishing
beyond a reasonable doubt defendant's intent to cause the death
of Benjamin.  Whereas, the conviction for depraved indifference
murder required establishing beyond a reasonable doubt

defendant's recklessness with respect to the creation of a grave risk of death of the victim under circumstances evincing a depraved indifference to human life, resulting in the victim's death.

The People contend that the existence of two outcomes, related to two different individuals, distinguishes this case from Gallagher, and instead, places it squarely within the line of analysis adopted in People v Trappier. In Trappier, the Court affirmed a defendant's conviction of attempted first-degree assault and first-degree reckless endangerment for firing three shots in the direction of his intended victim, reasoning that the defendant could have "intend[ed] one result -- serious physical injury -- while recklessly creating a grave risk that a different, more serious result -- death -- would [have] ensue[d] from his actions" (People v Trappier, 87 NY2d 55, 57 [1995]). The Trappier Court affirmed the principle that the separate mens rea of intent and recklessness "are not mutually exclusive when applied to different outcomes" (People v Trappier, 87 NY2d 55, 57 [1995]).

The fundamental error of the People's argument, as illustrated by their misplaced reliance on Trappier, is that while there are two distinct states of mind attendant to the murder counts, there is but one outcome in defendant's case: the death of the victim. The People seek to escape this conclusion by avoiding the analytic components of the transferred intent

theory.  The first step is to establish an intentional conscious objective to cause the death of another.  The second step is to establish that the act of shooting resulted in a death.  Thus, the legally significant question is whether the People have established the intent to kill, because "the identity of the victim is irrelevant" (Fernandez, 88 NY2d at 781).  By focusing on the intended victim rather than on the outcome that a murder was committed, the People ignore the essence of intentional murder based on transferred intent.  Here, unlike in Trappier, we address the application of the separate mens rea of intent and depraved indifference to the same outcome, a bystander's death, and hold that the two are mutually exclusive, even where the former is premised on the doctrine of transferred intent.

We conclude, therefore, that defendant could not be convicted of both intentional and depraved indifference murder, and that a new trial should be ordered on these counts.


III.

Defendant argues that the trial court violated his federal Sixth Amendment right to confrontation by admitting the unavailable witness's grand jury testimony because the People failed to present evidence that linked defendant to the alleged threats against the witness's family members.  Defendant further argues that the error is not harmless because it bolstered evidence that defendant was the aggressor, thus undermining

defendant's justification defense.  In response, the People contend that admission of the witness's grand jury testimony was proper because the evidence showed that the threats came from defendant's group, the Israelites, and that only the defense had knowledge the witness was scheduled to testify.  Therefore, the evidence sufficiently linked defendant to the threats.  In any event, the People contend the error was harmless because other evidence established defendant as the person who fired the first shot.

We are unpersuaded by the People's arguments and conclude that this evidence was insufficient to establish defendant's misconduct.  Moreover, admission of the grand jury testimony was constitutional error that, on the facts of this case, cannot be construed as harmless.

Defendant has a federal constitutional right to confront the witnesses against him (US Const Amend VI; Crawford v Washington, 541 US 36 [2004]). "As a general rule, the Grand Jury testimony of an unavailable witness is inadmissable as evidence-in-chief" (People v Geraci, 85 NY2d 359, 365 [1995] see also CPL § 670.20).  However, a limited exception to this prohibition, and to the prohibition against the admission of hearsay, applies where the People establish by clear and convincing evidence that "the unavailability was procured by misconduct on the part of the defendant" (id. at 366 [1995]).  Where the People establish that a witness is unwilling to testify

due to the defendant's own conduct, or by the actions of others "with the defendant's knowing acquiescence," defendant forfeits the right to confrontation, and such out-of-court statements are admissible (Geraci, 85 NY2d at 366).  This exception is based on "the public policy of reducing the incentive to tamper with witnesses" (id. at 367-68).

Here, the court determined that the witness's unwillingness to testify was due solely to the defendant, but the witness's testimony and the People's representations at the Sirois hearing provide no basis for this conclusion.  As the record shows, the witness identified "the Israelites" as the source of the threats to his family, but provided no evidence linking defendant to the threats or anyone who approached his siblings.  On the contrary, the witness was unable to say when or where the threats were made.  He could not describe who spoke to his brother, or how often and under what circumstances his brother was approached.  With respect to his sister, the witness never testified that she was personally approached and threatened.  Rather, he testified that she heard from someone that the Israelites believed the witness was snitching. Furthermore, the siblings never told the witness that they feared defendant, or that defendant encouraged the Israelites' suspicions about the witness.  Thus, the witness provided no information about any misconduct by defendant, nor did he provide any facts which support an inference that defendant planned or

engineered the threats.

Notably, the People failed to submit evidence that defendant communicated with anyone about the witness and his possible testimony, or that defendant "had the opportunity to arrange and orchestrate" any threats against the witness's family (People v Cotto, 92 NY2d 68, 77 [1998]).  Instead, the People promoted the inference that because they informed the defendants that the witness was going to testify, and the witness himself did not tell anyone that he was cooperating in the case, defendant must have been the source of the Isrealites's suspicions about the witness.  Even if the inference of a communication were appropriate on this record, the additional inference that the communication was necessarily intended and structured to procure the witness's unavailability is based on nothing more than pure speculation.

We disagree with our dissenting colleagues that in this case a bare, alleged communication revealing the identity of a witness, without some evidence of misconduct, provides a causal link between defendant and the witness's unwillingness to testify (Dis Op at 6).  Assuming defendant told someone that the witness was going to testify for the People, that alone does not constitute witness tampering or coercive behavior.  In order to infer the misconduct required by our case law, there must be some analytic basis to trace the threats back to defendant (see People v Smart, 23 NY3d 213, 220 [2014][the "People must demonstrate by

clear and convincing evidence that the defendant engaged in
misconduct aimed at least in part at preventing the witness from
testifying and that (defendant's) misdeeds were a significant
cause of the witness's decision not to testify"], citing Geraci,
85 NY2d at 366-368, and People v Maher, 89 NY2d 456, 462 [1997]).

Here, the only possible connection between defendant
and the source of the threats is defendant's association with the
Israelite congregation.  Yet, more than membership is necessary
to establish clear and convincing evidence of misconduct, and in
this case the record lacks any facts from which to infer
defendant is behind the Israelites' threats.  For example, there
is no evidence that defendant controlled the group's actions,
influenced members of the group to act, or that he persuaded any
individual Israelite to threaten the witness's family (see People
v Smart, 23 NY3d 213, 221 n 3 [2014]; Maher, 89 NY2d at 461;
Geraci, 85 NY2d at 366).

Unlike other cases where the defendant personally seeks
to threaten a witness or directs others to do so at the
defendant's behest, or where a defendant knowingly acquiesces,
here there is no similar evidence linking defendant to the
threats (see e.g. Smart, 23 NY3d at 221 [evidence sufficient
where recorded telephone conversations revealed that defendant
threatened the witness "with violence in response to [the
witness's] avowed willingness to testify and encourag[ed] [the
witness to disappear]," and further enlisted his mother to aid in

preventing the witness from testifying, all in furtherance of ensuring the witness's unavailability]).

While it is possible for the People to satisfy their burden without direct evidence of the defendant's attempts to dissuade the witness from testifying, there must be more than the conjecture relied upon by the People in defendant's case. Notwithstanding our dissenting colleagues' argument to the contrary, we do not adopt a new standard.  Indeed, we still adhere to a "flexible approach" to the admission of a witness's grand jury testimony that accounts for the reality that the People can rarely discover direct evidence of a defendant's role in making a witness unavailable, and we follow a "pragmatic framework" of inferential reasoning that "rel[ies] heavily on circumstantial evidence and the sequence of events" (Smart, 23 NY3d at 224, citing People v Encarnacion, 87 Ad3d 81, 85-89 [1st Dept 2011], and People v Clark, 55 AD3d 1447, 1448 [4th Dept 2008], lv denied 11 NY3d 923 [2009]).  We thus adhere to our longstanding requirement that the People present legally sufficient evidence of circumstances and events from which a court may properly infer that the defendant, or those at defendant's direction or acting with defendant's knowing acquiescence, threatened the witness (see Smart, 23 NY3d at 221 n 3; Maher, 89 NY2d at 461; Geraci, 85 NY2d at 366).

As the Court said in Geraci, the standard of proof imposed on the People in these cases is intended to be "high

enough to assure a great degree of accuracy in the determination of whether the defendant was, in fact, involved in procuring the witness's unavailability for live testimony" (Geraci, 85 NY2d at 368).  Here, the People relied on a speculative inference that defendant's association with the Israelites established his involvement in the threats to the witness's family, and in so doing failed to meet their heavy burden.

The constitutional error in admitting the unavailable witness's grand jury testimony requires reversal unless that error was harmless beyond a reasonable doubt, or in other words, "'there is no reasonable possibility that the error might have contributed to defendant's conviction'" (People v Smith, 97 NY2d 324, 330 [2002], citing People v Crimmins, 36 NY2d 230, 237 [1975]; see also Maher, 89 NY2d at 462).  Here, the witness's testimony that defendant fired the first shot directly contradicted defendant's testimony that he shot at Benjamin only after Benjamin shot at him.  Thus, the witness's testimony had an irrefutable damaging effect on defendant's justification defense.

The People contend that others provided testimony establishing defendant as the initial shooter.  The People rely on the testimony of A.M. and D.S., two of the men who went with Benjamin looking for defendant, and H.G., a resident in a building nearby who viewed the events from his window.  However, their testimony failed to establish defendant as the first to shoot.

Only A.M. testified that he saw defendant point a gun and heard defendant fire it, while observing Benjamin with his hands in his pockets.  Yet, this testimony pales in comparison to the witness's assertion that he saw defendant fire first.  Moreover, A.M.'s credibility was suspect because he initially lied to police about his presence at the shootout. A.M. also has a history of criminal convictions, including for burglary, petit larceny, attempted assault, and possession of marijuana.  Further, unlike the witness who appeared to be an unconnected and unbiased eyewitness, A.M. was part of the group who went to the building looking for defendant.  Recognizing these weaknesses, the prosecutor relied on the witness to bolster A.M.'s testimony and argued in summation that the witness's testimony corroborated A.M.'s statements.

The other group member, D.S., testified that he saw Benjamin pull out a gun and heard shots going back and forth, from two separate weapons. His testimony that the first shot he heard came from the direction of the building is a weak basis to conclude defendant was the initial shooter.  Even less helpful to the People is H.G.'s testimony, because he looked out of his window only after several shots were fired.

On the basis of the record, we conclude that there is a reasonable possibility that the witness's testimony influenced the jury's verdict on the intentional murder and attempted murder counts, because his testimony was material to the crucial issue

of whether defendant was the initial aggressor.  Therefore, a new trial should also be ordered on the attempted murder count.


                             IV.

          Defendant's remaining claims are easily disposed of. The claim that the evidence was legally insufficient is without merit because the evidence permitted the inference of a tacit agreement between defendant and Benjamin to engage in mutual combat (see People v Hines, 97 NY2d 56 [2001] [evidence legally sufficient where "any valid line of reasoning and permissible inferences could lead a rational person to the conclusion reached by the fact finder on the basis of the evidence at trial, viewed in the light most favorable to the People"], citing People v Williams, 84 NY2d 925, 926 [1994]).

          Defendant's challenge to the prosecutor's summation is unpreserved and his claim that trial counsel's failure to object to the prosecutor's summation deprived him of effective assistance of counsel is without merit (see People v Benevento, 91 NY2d 708, 713-714 [1998] [ineffective assistance of counsel claim requires defendant to show counsel's performance was deficient and that this deficiency prejudiced defendant such that defendant did not receive a fair trial]; People v Baldi, 54 NY2d 137, 147 [1981] [test for ineffective assistance whether defendant received meaningful representation]; People v Galloway,

54 NY2d 396, 399 [1981] [prosecutor permitted wide latitude in rhetorical comment in closing]).  Last, to the extent defendant's pro se brief can be interpreted to challenge the criminal possession conviction, we also hold that claim to be without merit.

                               V.

        The order of the Appellate Division should be modified by remitting to Supreme Court for further proceedings in accordance with the opinion herein and, as so modified, affirmed.

People v Darius Dubarry

No. 32


PIGOTT, J.(dissenting, in part):

The majority chooses to set aside defendant's conviction of attempted murder despite the fact that defendant admitted to firing at his intended target, Herburtho Benjamin. The majority is dissatisfied that the trial court admitted the grand jury testimony of an innocent bystander who, fearing for his family's safety, refused to testify truthfully notwithstanding the fact that the court learned from the witness's Sirois hearing testimony that his refusal was induced by defendant. Because the majority's rationale departs from our long-held jurisprudence concerning the admission of grand jury testimony where the People have established to the trial court's satisfaction that the defendant's actions were behind a witness's unavailability, I dissent. Defendant was not deprived of his Sixth Amendment right to confrontation and there is therefore no need for a retrial on the attempted murder count.

The following testimony was given by the eyewitness at the Sirois hearing: The day before the witness was set to testify against defendant, two of his siblings, who resided across the street from where the shooting occurred, visited him at a federal penitentiary. At that time, neither the witness nor

- 1 -

his siblings knew that he was slated to be a witness for the
prosecution.  Significantly, just one week earlier the People had
disclosed to the defense the witness's identity and the substance
of his statements implicating defendant in the shooting.

With no knowledge of his impending testimony, the
witness's 23-year-old brother told the witness that he had been
approached by the Israelites and that they had accused the
witness of "snitching."  The witness's sister reported that one
Kendrick, who was not an Israelite, told her that Israelite
members suspected the witness of snitching, and the brother
confirmed her account.  Each sibling told the witness that they
felt "like they were getting hostility in the neighborhood," and
the witness explained to the court that this caused him concern
for the safety of his family, given their proximity to where the
shooting occurred and the fact that, because of his
incarceration, he was unable to protect them from harm.  He also
explained that, but for the threats made to his siblings, "it
would be a different story" and he'd "be willing to testify."

These threats apparently worked because, when the
witness arrived at court the following day, he refused to
testify, telling the court that he "didn't see anything."  Of
course, this particular witness had seen plenty, as evidenced by
his grand jury testimony that was eventually read into the record

during the People's case-in-chief. That testimony established that he saw defendant step out of the building, light a cigarette and start shooting. His eyewitness testimony established that defendant started shooting first and corroborated the testimony of other eyewitnesses. Thus, he was not an insignificant witness and, in fact, may have been one of the People's strongest, which explains why defendant would not have wanted him to testify.

Following appropriate procedure, in light the witness's refusal to testify, the trial court conducted a Sirois hearing, where the witness expressed the reasons for his fear of testifying against defendant as summarized above. The court asked him if he could be compelled to testify if the court held him in contempt and sentenced him to an additional 30 days in jail, but the witness stated that would not change his mind. He was subjected to cross-examination by defense counsel, and remained steadfast in his assertions that threats were made against his family and that he did not want to testify for that reason.

At the conclusion of the hearing, the People argued they had not released the witness's statements to the defense until the previous week, and it was only reasonable for the court to infer that it was defendant who disclosed to Israelite members that the witness's anticipated testimony would be damaging to

defendant.  The trial court agreed, and the Appellate Division affirmed that determination.

Grand jury testimony of an unavailable witness is not admissible as direct evidence against the defendant unless the defendant caused the witness's unavailability through "violence, threats or chicanery," thereby precluding the defendant from asserting a violation of his right of confrontation (People v Cotto, 92 NY2d 68, 75-76 [1998], citing People v Geraci, 85 NY2d 359, 366 [1995]).  The reasons for allowing such testimony are twofold: a defendant should not benefit from his own wrong, and the integrity of the adversary process mandates deterring defendants from attempting to squelch the damaging testimony of an adverse witness (see Geraci, 85 NY2d at 366, 368 [citations omitted]).  We have deemed such policies "important" enough to allow "circumstantial proof" in light of "the inherently surreptitious nature of witness tampering," acknowledging that "it would be unrealistic and unnecessary to adopt a formula that would make it impossible to establish the foundation [for the admission of grand jury testimony] in so many cases" (id. at 369).  In my view, the majority's opinion does just that.

The majority emphasizes that the witness could not "identify who specifically spoke to his brother" and that "the witness never testified that [his sister] was personally

approached and threatened," only that she "heard from someone [named Kendrick] that the Israelites believed the witness was snitching" (majority op, at 18).  The identity of who exactly made the threats, although undoubtedly helpful, is not required to establish defendant's link to them because "[r]equiring specific identification in situations invariably involving surreptitious conduct permits easy evasion of the principle, and sound public policy, that defendants should neither interfere with witnesses nor benefit from such wrongful conduct" (Cotto, 92 NY2d at 77 n 1).  A resourceful defendant need not be a card-carrying member of Mensa to realize that it is in his best interest that the identity of the person making the threats remain a secret, lest the People be able to link the defendant to the individual and, by implication, the threats themselves. Thus, merely because the witness and his siblings were unable to identify who actually made the threats does not factor into the equation.

The majority asserts that "the only possible connection between defendant and the source of the threats is defendant's association with the Israelite congregation" and that "more than membership" is required, such as evidence that defendant "controlled the group's actions, influenced members of the group to act, or that he persuaded any individual Israelite to threaten

the witness's family" (majority op, at 20).  But not every instance of witness tampering involves a taped jailhouse telephone conversation where the defendant threatens a specific witness (see People v Smart, 23 NY3d 213, 216 [2014]), or a defendant who is out on bail and therefore has "the opportunity to orchestrate [the] intimidation" (Geraci, 85 NY2d at 369; see Cotto, 92 NY2d at 77-78 [defendant out on bail when threats were made and had the opportunity to arrange and orchestrate the threats]).  Unlike the defendants in Geraci and Cotto, who knew the witness's identity months before trial and, in fact, knew that the witness had witnessed the crime, defendant in this case had no idea that this particular witness observed the offense and did not know that he was going to testify until the week before trial.

        We have made clear that the absence of direct evidence is not fatal to the People's proof because "witness tampering is a surreptitious activity rarely admitted by the defendant or the witness" and "few cases will involve direct evidence of this causal link between the defendant's misconduct and the witness's refusal to testify or failure to appear in court" (Smart, 23 NY3d at 220 [2014], citing Geraci, 85 NY2d at 369; Cotto, 92 NY2d at 76-77).  As such, the trial court, after listening to and evaluating the witness's testimony, is permitted to "infer the

requisite causation from the evidence of the defendant's coercive behavior and the actions taken by witnesses in direct response to or within a close temporal proximity to that misconduct" (Smart, 23 NY3d at 220-221, citing Matter of Holzman v Hellenbrand and Sirois, 92 AD2d 405, 415 [2d Dept 1983]).

Here, the People proffered sufficient evidence for the trial court to draw a permissible inference that defendant's misconduct caused the witness to become unavailable. He explained that he was not aware that he would be testifying until that very morning, and that he had been visited by his siblings the day before, which is when he learned of the threats and feared for his family's safety. It is irrelevant that the witness's siblings did not tell him that they feared defendant (majority op, at 18). The intended effect is to have the prospective witness refuse to testify or suffer an unexpected memory loss, and, here, the witness's candid statements to the court, tested by the defense on cross-examination, created the obvious inference that defendant played a role in his refusal to testify.

When the witness's siblings conveyed their concerns to him, neither he nor they knew that he was scheduled to testify the following day, nor did his brother know that he had previously provided information regarding defendant's case.

But defendant knew both of these things.

The witness did not discuss his potential testimony with any of his family members or any of the inmates with whom he was serving time. When the siblings disclosed the threats to him, the defense had been in possession of his statements for a week. Given this testimony, the court reasonably inferred that defendant was behind the threats, and those inferences should not be disturbed by this Court.

The majority states that "[e]ven if the inference of a communication were appropriate on this record" -- (and it clearly is) -- "the additional inference that the communication was necessarily intended and structured to procure the witness's unavailability is based on nothing more than suspicion" (majority op, 19). Given all of the facts, and in light of the witness's decision to not testify and his stated reasons, the trial court drew the inference that threats made to his family days before trial, after the defense learned of his damaging statements, were caused at the direction of defendant. That is the fact finder's job, not ours.

The majority insists that it is not adopting a new standard (majority op, 21), but given its interpretation of our jurisprudence in this area, it clearly is. We are turning an evidentiary determination into a trial within a trial. Simply

put, the majority's holding rewards surreptitious conduct by defendants, allowing them to tamper with and intimidate witnesses so long as they do it quietly without leaving a trail that leads to the defendant. The trial court here made a permissible, logical inference, and the Appellate Division agreed. Those determinations should be affirmed.

This witness was an unconnected and unbiased eyewitness. The jury, apparently crediting his grand jury testimony that he was in an apartment across the street from the shooting and witnessed defendant fire the first shot, convicted defendant of not only of two counts of second-degree murder, but also of attempted murder in relation to his shooting at Benjamin.

Defendant will receive a new trial on the intentional and depraved indifference murder counts because the trial court erred in charging those counts in the conjunctive. But there is no reason to tamper with the attempted murder count as it relates to defendant's criminal conduct toward Benjamin. The jury found that defendant, without justification and with the intent to cause Benjamin's death, attempted to cause his death. The witness's testimony that defendant shot first supports that conclusion. Now, upon a retrial, that testimony will be withheld from the jury. The grand jury testimony will not be admissible and a new jury will be asked to make a determination without that

eyewitness testimony.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

Order modified by remitting to Supreme Court, Kings County, for
further proceedings in accordance with the opinion herein and, as
so modified, affirmed.  Opinion by Judge Rivera.  Chief Judge
Lippman and Judges Abdus-Salaam and Stein concur.  Judge Pigott
dissents in part in an opinion in which Judges Read and Fahey
concur.


Decided April 7, 2015